IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,  |

v.                                              |  CRIMINAL CASE NUMBER:

CHRISTINA MARIE WILSON,  |  1:16-CR-00027-4-AT-JSA

## FINAL REPORT AND RECOMMENDATION

Defendant is a former prison guard at Autry State Prison in Pelham, Georgia, who is accused of smuggling contraband into the prison.  The case is before the undersigned on Defendant's Motion to Suppress Search and Seizure Evidence [76] and Motion to Suppress Statements [75].  For the reasons stated below, the undersigned **RECOMMENDS** that the motions be **DENIED**.

## I.      BACKGROUND

### A.      Issuance Of The Search Warrant

On September 29, 2015, upon the application of Special Agent Casey Roberts of the Georgia Department of Corrections, the Magistrate Court of Doughtery County, Georgia issued a warrant authorizing the search of (1) a 1999 Jeep Cherokee registered to Defendant Christina Wilson, (2) the residence of Defendant Wilson, and (3) any cell phones belonging to Defendant Wilson.  *See* [84-1] at 1.

S/A Roberts' affidavit stated that, on August 26, 2015:

On 9/2012015, Special Agents Tim Jackson and Mark Kinservik, both Peace Officer mandated employees with the Georgia Department of Corrections, responded to Autry State Prison in Camilla, Georgia in response to Investigating an employee, Correctional Officer Dayia Gilbert, who had attempted to bring contraband into the facility. The contraband was found later to be tobacco and 28.8 grams of marijuana. During a Mirandized Interview, Gilbert stated that he had picked up this package of contraband and others from a white female in Baconton, Georgia at the Dollar General on the past Friday and Saturday nights. He was to meet her that night to get paid by the white female, and was expecting to receive approximately $3000.00. Gilbert stated he had previously picked up packages of marijuana, and he was to give the marijuana and other contraband to Inmate Derrick Lorenzo Watson, a known and verified Gangster Disciple Gang Member. Gilbert stated he had been having problems at work and had lost pay due to being written up several times. He states he was approached by a white female who offered him a way to make some extra money. He states the offer was about 6 months prior and that the female drives a white Jeep Cherokee. In addition to the Dollar General, Gilbert has also met at the Wal-Mart in Camilla, Georgia for arranged drop offs. Gilbert admitted that he had made more than $7000.00 doing this. Gilbert did state that on some occasions he was met by a black female who was driving the white Cherokee for the exchanges. The search of Gilbert's vehicle revealed that he had in his possession a $1000.00 yellow and white money wrapper located inside his door. Gilbert was also in possession of a loaded 9MM Pistol and several cell phones. A search of the phone revealed Gilbert was communicating with Inmate Derek Watson through text messages regarding meeting with the W/F who was delivering the contraband.

On 8/26/2015 at approximately 1453 hrs, an unknown caller called the Albany Crime Stopper tip line and reported that a white female named Christina M Wilson, had been taking contraband into Autry State Prison for approximately 3 years. The caller described Wilson as a white female, with blonde hair in a "long length bob" fashion but "sometimes wears it in a ponytail". The caller gave Wilson's date of birth as March 28th, 1981, which is correct, indicating the caller had personal knowledge of Wilson. The caller described Wilson's vehicle as an "older" Jeep Cherokee, white In color, tag number BCZ3944, and that

the back doors do not open from the outside. The vehicle Information was verified correct through GCIC. (See attachment). The caller indicated that Wilson has an inmate boyfriend named Dereck Lorenzo Watson at Autry State Prison, and has her own Facebook page under the name Christina Watson. The caller stated Wilson meets various Correctional Officers at Autry State Prison and they smuggle the contraband inside the facility for her and give it to "Dereck", and believes that she pays the officer between $1000.00 and $2000.00 to do this. The caller stated that Wilson does not have a job, collects child support, and has two children at home, a 9 year old boy and 13 year old girl. (Crime Stopper report is attached).

Christina Wilson is a former Correctional Officer at Autry State Prison, released in 2013 for attempting to hide contraband cell phones for inmates. She was found in possession of multiple cell phones during a building "shakedown" by staff in search of contraband.

Christina Wilson has been a part of an ongoing investigation into corruption within the Georgia Department of Corrections and it has been verified as part of that investigation that Wilson had moved more than $14,000 in money transfers for illegal contraband within the State Prison System for multiple inmates.

During the course of the ongoing investigation Christina Wilson has been observed on CCTV at the Wal-Mart in Albany, GA making large cash withdrawals and money transfers using prepaid financial cards.

Through the course of this investigation Affiant has received information that Christina Wilson has close ties to Criminal Street Gang members inside the Georgia Department of Corrections.

[84-1] at 2.

   Surveillance and records checks conducted by the agents also confirmed that

Defendant had a Jeep Cherokee registered to her name and address and that was

generally parked in the carport of that residence. *Id.* at 2-3.  The warrant identified

eleven items and categories of evidence to be searched for including "pre-paid financial transaction cards," and "receipts of financial transactions to facilitate contraband inside GDC facilities."  *Id.*

### B.   Defendant's Statements During The Execution of the Search Warrant

Defendant's motion to suppress statements are addressed to various statements she made to the law enforcement officers during and immediately following the execution of the search warrant in her home.

Specifically, various law enforcement agents led by the Georgia Department of Corrections executed the Dougherty County search warrant at Defendant Wilson's residence beginning at about 8:30 am on September 30, 2015.  Transcript of July 29, 2016 evidentiary hearing [88] ("Tr.") at 7-10.  The team included 8 or 9 agents, most of whom were dressed in plain clothes.  *Id.* at 9, 18-19, 28, 55.  The officers kept their firearms holstered during the entire search.  *Id.*

Special Agent Roberts led the search team, introduced himself to Defendant at the inception of the search, provided Defendant a copy of the warrant, and informed her several times that she was not under arrest.  *Id.* at 11, 21.  FBI Special Agent Thomas Clark and Task Force Officer Patrick Wolfe–who ultimately interviewed Defendant–likewise advised Defendant that she was not under arrest.  *Id.* at 31, 41.  S/A Roberts also testified that Defendant was "probably" patted

down, but was told that she was free to go or to not talk with the officers at any time.  *Id.* at 12.  S/A Roberts stated that the Defendant was "a little hesitant" and nervous at first, but agreed to speak to the agents.  *Id.* at 12-13.  After speaking to the agents, the Defendant agreed to take the agents to a safety deposit box at a nearby bank where she had over $7,000 in cash relating to her scheme to help smuggle contraband to inmate Watson.  *Id.* at 15.  It is undisputed that the agents never provided *Miranda* warnings during this encounter.

Four members of the search team testified at the evidentiary hearing – S/A Casey Roberts, TFO Patrick Wolfe, FBI S/A Thomas Clark, and Investigator Nora Bricker.  According to the agents, Defendant was allowed to change clothes before leaving the house to go to the bank.  *Id.* at 16.  The female agent that was present–Investigator Bricker–accompanied Defendant into the bathroom while Defendant changed clothes.  *Id.* at 16, 43, 54-56.  Investigator Bricker testified that she never searched, patted down, frisked, or even touched Defendant in any way, and that she completely closed the bathroom door while Defendant was changing, for privacy.  *Id.* at 56.  Investigator Bricker specifically denied strip searching Defendant, and each of the testifying agents denied participating in or being aware of a strip and/or body cavity search of the Defendant.  Tr. at 16, 31, 43, 56.

According to the Defendant, who testified at the evidentiary hearing, a female officer took her into the bathroom immediately after the initial protective

sweep of the house, and performed a strip and body cavity search of the Defendant. Tr. at 65-66.  The Defendant testified that the female agent did not even close the bathroom door all the way, so that the searches were not private vis-a-vis the male agents otherwise in the house.  *Id.*  The Defendant explained that she was upset and crying because the strip search brought back memories of violent sexual assaults she suffered repeatedly as a child.  *Id.* at 67.  It was only after this event that the Defendant began speaking to the agents.  *Id.* at 65-67.  She testified that she was nervous and scared, and "I was overwhelmed with very – felt withdrawn.  I felt that if I didn't do what they told me to do, I would get in even more trouble.  I didn't know what else to do."  *Id.* at 71.  The Defendant denied that she was advised she was free to leave, although she did not deny being told that she was not under arrest.  *Id.*  She acknowledged that the agents retrieved her cigarettes for her and allowed her to smoke during the interview.  *Id.*

At the evidentiary hearing, the Defendant called Dr. James Powell, PhD, who has diagnosed Defendant with and treated her for Post Traumatic Stress Disorder ("PTSD") relating to a history of childhood abuse.  *Id.* at 82, 85. According to Dr. Powell, a new stressful experience can trigger in a patient suffering from PTSD an episode where "you re-experience it all over again, all the adrenaline flow, all the fear, all the anxiety, all the horror of whatever that traumatic thing was."  *Id.* at 84.  The possibility in such a circumstance is that the

patient might engage in "avoidant behavior," where he or she detaches from the situation "in order to cope," and might become more compliant with requests or demands to "try to appease or anything to avoid the horrible situation." *Id.* at 86. Thus, a patient suffering from such an attack might be more prone to "say anything to avoid the continuation of the interrogation, and you get false confessions." *Id.* Dr. Powell also testified, however, that a patient with PTSD who suffers some subsequent episode of stress or trauma may have impaired recollection of those stressful events. *See id.* at 90.

## II.    ANALYSIS

### A.    Motion to Suppress Search Warrant

A magistrate judge asked to issue a search warrant must make a practical decision, given all the facts set out in the application, that there is a fair probability that contraband or evidence of a crime will be found in a particular place. *See Illinois v. Gates*, 462 U.S. 213 (1983). Courts reviewing the sufficiency of warrant applications after-the-fact should not do so in a hyper technical manner; Rather, courts must employ a realistic and common sense approach so as to encourage recourse to the warrant process and to recognize the significant deference afforded to the decisions of the issuing magistrate judge. *Id.*; *United States v. Miller*, 24 F.3d 1357 (11th Cir. 1994).

Moreover, regardless of whether it would have issued the warrant, the

reviewing court  must deny suppression on the grounds of good faith reliance unless the affidavit was so lacking in indicia of probable cause so as to render official belief in its existence entirely unreasonable.  *United States v. Martin*, 297 F.3d 1308 (11th Cir. 2002).

Defendant filed a barely one-page motion to suppress evidence that makes two one-sentence arguments: that the "reliability and credibility of the unknown caller" who provided the main tip as to Defendant Wilson's involvement in smuggling contraband "was never established," and "[t]here was no valid affidavit [on] which to base the search." Motion [76] at 1-2.  The Government filed a detailed response memorandum [84], to which Defendant has never responded.

Defendant's argument that "[t]here was no valid affidavit [on] which to base the search" is conclusory and completely unexplained.  The Government has filed the affidavit executed by S/A Roberts [84-1].  The Court has no basis to *sua sponte* declare this affidavit to be invalid or to treat this point as anything other than an abandoned, unsubstantiated, throw-away argument.

Defendant's argument as to the reliability of the unknown caller is more understandable, but also clearly fails. In assessing whether information from an anonymous tipster or other informant rises to the level of probable cause, the issuing magistrate is to consider the totality of circumstances, including facts showing a tipster's basis of knowledge and facts relating to his her veracity.  *See*

*Gates*, 462 U.S. at 230-35.  Although independent police corroboration of a tipster's information is not *per se* required, *see United States v. Brundidge*, 170 F.3d 1350, 1353 (11th Cir. 1999), at least partial corroboration of even innocent details of a tip can be sufficient to establish probable cause.  Indeed, this was the result in the seminal case of *Gates*.  In that case, the Supreme Court found that an anonymous tip of a defendant's drug dealing activities, when combined with the investigators' corroboration of certain otherwise innocent travel details provided in the tip, was sufficient to establish probable cause.  *Gates*, 462 U.S. at 230-235. Applying these standards, and considering the totality of the circumstances, the affidavit presented to the Dougherty County Magistrate Court was more than adequate.

First, the tipster did not offer vague or equivocal information.  Rather, the tipster provided specific information, including identifying Defendant and her co-conspirator (Watson) by name and, in Defendant's case, by precise physical description, providing the model and tag number of Defendant's car (a white Jeep Cherokee), and detailing specifics about her scheme including how much money she pays officers to smuggle contraband (between $1,000 and $2,000).  [84-1] at 2. Indeed, the affiant concluded from this information that the caller had personal knowledge of Defendant.  And it would have been reasonable to conclude from the detailed nature of this information that the tipster had first hand knowledge or

learned this information from a source that did.

Second, most importantly, the affidavit provided substantial corroborating information.  Specifically, about three weeks after the anonymous tip, a guard (Gilbert) was caught smuggling contraband into the prison for Watson.  *Id.*  Gilbert stated that she was recruited into the scheme by a white female driving a white Jeep Cherokee, in a manner that matched the scheme described by the anonymous caller as involving Defendant.  *Id.*  A search of Gilbert's car also revealed a $1,000 money wrapper, consistent with the amount of money that the anonymous tipster stated that Defendant would provide.  *Id.*

Moreover, the affidavit explained that Defendant was a former Correctional Officer at Autry, had been released in 2013 for attempting to hide contraband cell phones, that investigation had confirmed her involvement in transferring $14,000 in money transfers for contraband sales on behalf of inmates, and that she had been observed on closed circuit TV making large cash withdrawals and money transfers using prepaid financial cards.  *Id.*  All of this information combined to establish far more corroboration and reliability than what the Supreme Court determined was sufficient in *Gates*.  The Defendant's one-sentence reliability argument does not address any of this information, and rather suggests, incorrectly, that S/A Roberts'

affidavit was solely based on a single anonymous call.  This argument fails.[1]

## B.   Motion to Suppress Statements

### 1.   *Application of Miranda*

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that a suspect who is in custody must be advised of her rights to remain silent and to the assistance of counsel prior to any interrogation by law enforcement.  It is undisputed the officers did not furnish *Miranda* warnings to Defendant and that she was nevertheless interrogated.  The question, however, is whether the Defendant was "in custody" at the time of this interrogation, because otherwise the protections of *Miranda* simply do not apply.  *See* United *States v. Acosta*, 363 F.3d 1141, 1148 (11th Cir. 2004).  Defendant summarizes the sole legal argument that she puts forward in support of her motion to suppress statements, as follows:

> Wilson was in a custodial situation during her interrogation whereby Miranda warning should have been given and were required to be given and that, as a result, the government is prohibited from using any of the statements made by Wilson before, during or after the interrogation and that the government is prohibited from mentioning the money found and seized in the safety deposit box and that the government is prohibited from using any evidence or statements derived from Wilson's statements.

[91] at 13-14.

The Supreme Court in *Miranda* explained that "custodial interrogation"

---

[1] Even if the existence of probable cause could be debated, Defendant falls far short of her burden to show that the officers could not have relied on this warrant in good faith.  This alone warrants denial of the motion.

means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444.  The Court subsequently defined "custody" in this context as a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quotation marks omitted).  It is the Defendant's burden to demonstrate that he or she was in "custody" during questioning and that *Miranda* thereby even applies.  *See United States v. de la Fuente*, 548 F.2d 528 (5th Cir. 1977)[2]; *see also United States v. Peck*, 17 F.Supp.3d 1345, 1353-55 (N.D.Ga. 2014) (Totenberg, J.)

The Supreme Court has more recently provided a non-exhaustive list of factors courts should consider in determining whether a suspect is in "custody" for purposes of *Miranda*:

> As used in our Miranda case law, "custody" is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of "the objective circumstances of the interrogation," Stansbury v. California, 511 U.S. 318, 322–[ ]23, 325, 114 S.Ct. 1526, 128 L.Ed.2d 293[ ] (1994) (per curiam), a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." Thompson v. Keohane, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). And in order to determine how a suspect would have "gauge[d]" his "freedom of

---

[2] The Eleventh Circuit has adopted as binding precedent all published decisions rendered by the U.S. Court of Appeals for the Fifth Circuit prior to September 30, 1981.  *See Bonner v. Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*).

movement," courts must examine "all of the circumstances surrounding the interrogation." Stansbury, supra, at 322, 325, 114 S.Ct. 1526 (internal quotation marks omitted). Relevant factors include the location of the questioning, see [Maryland v.] Shatzer, [559 U.S. 98, 110–17], 130 S.Ct. [1213], 1223–[ ]26, 175 L.Ed.2d 1045 [ (2012) ], its duration, see Berkemer v. McCarty, 468 U.S. 420, 437–[ ]38, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), statements made during the interview, see [Oregon v.] Mathiason, [429 U.S. 492], 495, 97 S.Ct. 711, 50 L.Ed.2d 714 [ (1977) ]; Yarborough v. Alvarado, 541 U.S. 652, 665, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004); Stansbury, supra, at 325, 114 S.Ct. 1526, the presence or absence of physical restraints during the questioning, see New York v. Quarles, 467 U.S. 649, 655, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), and the release of the interviewee at the end of the questioning, see California v. Beheler, 463 U.S. 1121, 1122–[ ]23, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam).

Determining whether an individual's freedom of movement was curtailed, however, is simply the first step in the analysis, not the last. Not all restraints on freedom of movement amount to custody for purposes of Miranda. We have "decline[d] to accord talismanic power" to the freedom-of-movement inquiry, Berkemer, supra, at 437, 104 S.Ct. 3138, and have instead asked the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda. "Our cases make clear ... that the freedom-of-movement test identifies only a necessary and not a sufficient condition for Miranda custody." Shatzer, 559 U.S. at ——, 130 S.Ct. at 1224.

*Howes v. Fields*, —— U.S. ——, 132 S.Ct. 1181, 1189–90, 182 L.Ed.2d 17 (2012);

*see also United States v. Luna–Encinas*, 603 F.3d 876, 881 (11th Cir. 2010)

(explaining that "although a reasonable person in the defendant's position may feel

constrained not to leave the scene of a police encounter at a particular

moment—and thus may be deemed to have been 'seized' by law enforcement—he

will not necessarily be considered in 'custody' for Fifth Amendment purposes....

Rather, 'a free-to-leave inquiry reveals only whether the person questioned was seized.' ... While 'seizure is a necessary prerequisite to Miranda, ... a court must [also] ask whether ... a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest.'") (citations omitted).

On this record, Defendant does not sustain her burden to show that she was "in custody." Defendant was not arrested, taken to a squad car, transported to a police station, or even briefly handcuffed. To the contrary, S/A Roberts specifically testified, and Defendant does not deny, that he (S/A Roberts) told Defendant that she was ***not*** under arrest. Advice such as this is "a powerful factor in the mix, and generally will lead to the conclusion that the [person] is not in custody absent a finding of restraints that are 'so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview.'" *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006). The Defendant was also interviewed in her own home, and courts "are *much less likely* to find the circumstances were custodial when the interrogation occurs in familiar or at least neutral surroundings,' such as a the suspect's home." *Id*. at 1348 (emphasis in original, internal citations omitted).

While the presence of multiple officers performing a search would obviously be unnerving, it is far from sufficient to show that a reasonable person would have

believed themselves to be under arrest.  Indeed, the courts have found far more
threatening activity not to constitute custody for purposes of *Miranda*.  *See United
States v. Luna-Encinas*, 603 F.3d 876 (11th Cir. 2010) (suspect was not "in
custody" despite being approached by multiple officers with drawn guns, being
ordered to raise his arms and sit on the ground).

The evidentiary hearing in this case was dominated by the unusual factual
dispute over whether or not the Defendant was strip searched and forced to expose
her body cavities at the inception of the search warrant.  Even if this had happened,
it would remain the Defendant's burden to show that this intrusion was "so
extensive" that the officers' assurance that she was not under arrest and other
factors could not cure the custodial aspect of the interview. *Brown*, 441 F.3d at
1347.  Defendant cites no legal authority for the conclusion that a strip search
necessarily renders a police encounter to be "custodial," regardless of the other
circumstances.  In fact, this Circuit has not generally found a strip search to *per se*
convert an encounter into a custodial arrest for purposes of *Miranda*, where the
statement is made after the completion of that search.  *Cf. United States v. McCain*,
556 F.2d 253, 255-256 (5th Cir. 1977) (not finding that airport traveler was
necessarily still "in custody" after completion of a strip search, but rather, "[s]ince
the statement which was allegedly obtained in violation of Miranda was made after
the strip search, it is necessary to determine whether the defendant was still in

custody at the time the statement was made"; in that case, the Court ultimately found based on the facts of that case, including that the traveler's luggage was seized and that she was not free to leave the airport with her belongings, that the traveler was, in fact, still in custody for purposes of *Miranda*).

Although the question would obviously be much closer, the Court still finds that Defendant has failed to meet her burden to show custodial status, even if the strip search had occurred as she described. The remainder of the facts still strongly point to a finding of non-custody, including that the officers assured Defendant that she was not under arrest, that all of this occurred in Defendant's own residence, that she was provided the opportunity for food, drink and cigarettes, and that none of the officers drew weapons, placed her in handcuffs, took her to a squad car, or did anything else emblematic of an arrest. While Defendant may have had reacted with particular distress to the search because of her history and mental condition, those considerations are irrelevant to the determination of custodial status. Rather, custodial status is determined on an objective basis, that is, whether a reasonable innocent person would have believed in these circumstances that she was in custody. *See Luna-Encinas*, 603 F.3d at 881.

Regardless, the Court has little hesitation in concluding that this strip and body cavity search did not happen as Defendant describes. Investigator Bricker–the female agent who took Defendant into the bathroom–denied that any

such search took place or that she even touched Defendant at all.  The testimony

from multiple officers also indicates that this bathroom trip–which was for the

purposes of allowing the Defendant to change her clothes before leaving with the

officers to go to the bank deposit box–occurred well after the interview was

underway.  Indeed, the notion of leaving to go to the bank only came up after the

Defendant had already spoke with the agents in some detail and explained that

there was cash at the bank.

To the extent Defendant testified otherwise, the Court simply finds that

testimony to be incredible.  This does not necessarily mean that the Defendant was

lying.  Notably, Defendant's treating psychologist–Dr. Powell–specifically

testified that Defendant's perception and memory of the events of September 30

may be impaired by virtue of whatever distress she may have felt that morning.

Whether because of this unintentional reason or otherwise, the evidence as a whole

strongly suggests that Defendant's account of the bathroom incident is inaccurate.

There remains no logical explanation, and the Court finds it highly

implausible, that the agents would somehow begin the execution of this residential

search with a body cavity search of the Defendant.  This would be a highly

intrusive and, absent a warrant, possibly an illegal violation of the Defendant's

Constitutional rights.  Defendant's theory is that one or more officers decided to

engage in this career-ending violation, in front of or in the close vicinity of a dozen

or so other law enforcement officer witnesses, all from a variety of different federal and state agencies.   There is absolutely nothing in the record to suggest any motivation to attack the Defendant in this way, particularly in the vicinity of so many witnesses.

Moreover, there is simply no evidence to suggest that an officer, even one disdainful of the Constitution, would have believed such a step to be fruitful here. There is no evidence that the agents suspected that the Defendant was aware that the search was imminent, or that even if she were, that she would take the highly bizarre step of hiding evidence in her body cavities, as opposed to taking much more expedient steps such as flushing it down the toilet, burying in her backyard, or simply fleeing from her house before the officers arrived.  There is no evidence that the agents would have suspected that Defendant otherwise regularly hid materials in her body cavities while in the privacy of her own house on ordinary mornings.  Nor is there any suggestion that the agents were aware of Defendant's alleged psychological history and vulnerabilities such that they may have been motivated to take advantage of those things.

And any plan by the officers to provoke a confession with this abusive conduct would seem inconsistent with the other evidence, including that the officers never unholstered their weapons, never made threats, never handcuffed or restrained her, assured the Defendant that she was not under arrest, furnished her

cigarettes upon request, and never even put in her a squad car much less transport her away from the scene.  One would naturally think that officers scheming to provoke a confession by engaging in an illegal body cavity search would have otherwise acted more belligerently in at least some of these other ways.  Indeed, the Court has reviewed the audio recording that covers at least some of the September 30, 2015 home interview.[3]  *See* Gov't Ex. 2.  The agents spoke cordially and politely, and the Defendant from her tone did not appear to have been so recently subjected to the sort of trauma she now alleges.  Thus, to the extent it is necessary to resolve this factual dispute, the Court finds in the prosecution's favor.

Therefore, Defendant was not "in custody," and the agents were not obliged under *Miranda* to furnish any advisements.  Defendant's motion to suppress on grounds of *Miranda*–which are the only grounds that continue to be asserted in the post-hearing briefing–should be denied.

### 2.  *Voluntariness*

If a Defendant challenges the voluntariness of her statements to law

---

[3] The disc marked at Exhibit 2 has three files, the first of which appears to record part of the interview at the home, and the others appear to have occurred later that same morning, including at the bank.  The first file appears to be incomplete, in that it seems as if there was likely some discussion that occurred prior to when that recording began.  Therefore, the Court assumes that this recording reflects some, but not all, of the interview at the residence in the time period immediately after the alleged strip and body searches.

enforcement, the Government bears the burden to show that the Defendant's statements were made voluntarily. *See Jackson v. Denno*, 378 U.S. 368 (1964). Determining whether a statement is voluntary depends on whether, under all of the surrounding circumstances, the statement was the product of the accused's "free and rational" choice. *United States v. Jones*, 32 F.3d 1512, 1516 (1994); *see Arizona v. Fulminate*, 499 U.S. 279, 285–88 (1991). The Eleventh Circuit has stated:

> Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. Isolated incidents of police deception, and discussions of realistic penalties for cooperative and non-cooperative  defendants, are normally insufficient to preclude  free choice.

*Jones*, 32 F.3d at 1517 (quotation omitted).

The primary focus of the voluntariness inquiry is whether there has been police overreaching. *United States v. Bernal–Benitez*, 594 F.3d 1303, 1319 (11th Cir. 2010). The Court looks to the totality of the circumstances to determine whether a confession was voluntary, "including the details of the interrogation and the defendant's characteristics." *Id.* Ultimately, the question is whether the defendant "made an independent and informed choice of his own free will, possessing the capability to do so, his will not being overborne by the pressures and circumstances swirling around him." *United States v. Rouco*, 765 F.2d 983,

993 (11th Cir.1985) (citation and quotations omitted). Among the non-exclusive factors to consider are the Defendant's education and intelligence, length of detention, length of questioning, the use of coercive interrogation techniques and whether Defendant was advised of her constitutional rights. *Id.*

Defendant's initial 2-page, boilerplate motion to suppress conclusorily alleged the involuntariness of her statements and referenced *Jackson v. Denno.* However, Defendant makes no factual or legal arguments in support of an involuntariness argument, and does not even reference that argument in her post-hearing brief.  And Defendant did not file a reply to the Government's response, which characterizes the Defendant's suppression argument as solely boiling down to whether the Defendant was "in custody" for purposes of *Miranda.* [95] at 8-10. Therefore, it appears that the Defendant has abandoned her suppression argument to the extent based on alleged involuntariness.

Nevertheless, the evidence sufficiently shows voluntariness for much of the same reasons discussed above.  Again, the agents told the Defendant that she was not under arrest and that she was free to leave and refuse to speak.[4]  That the

---

[4] As noted in the factual background above, Defendant denied that she was advised she was free to leave, but did not refute that she was advised that she was not under arrest.  For all of the reasons stated above, the undersigned finds Defendant's testimony as to the events of that morning to be inaccurate and therefore places little weight on her denial that she was advised that she was free to leave.  Thus, the essentially unrefuted testimony is that of the agents, that Defendant was told she was free to leave and not to speak with them.  Tr. [88] at

interview took place at Plaintiff's own residence is also strong evidence of

voluntariness.  And the agents' tone during the September 30 interview–as

reflected in the recording (Ex. 2)–was cordial and respectful.  Further, Defendant

continued to be cooperative and answer the officers' questions on at least two other

subsequent occasions.  Tr. at 32-33, 37, 44-46, 51-52.  Obviously, by the time of

these subsequent visits over two months later, the stress of the events of September

30 would have greatly lessened, and yet the Defendant still spoke to and assisted

the officers.  Finally, the Court again reiterates its finding that Defendant was *not*

subjected to a strip and/or body cavity search prior to the interview, or at all.

## CONCLUSION

Thus, Defendant's Motions to Suppress Evidence [76] and Statements [75]

should be **DENIED**.  This matter is **READY FOR TRIAL**.

**IT IS SO RECOMMENDED** this 29th day of November, 2016.

_____

JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE

---

12.