IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| v. | : CRIMINAL CASE NUMBER: |
| CHRISTINA MARIE WILSON, | : 1:16-CR-00027-4-AT-JSA |

### SUPPLEMENTAL REPORT AND RECOMMENDATION

This matter is before the undersigned on Defendant's Motion to Suppress Statements. The undersigned previously issued a Report and Recommendation, dated November 29, 2017 [Doc. 96] ("Initial R&R") that recommends denial of the Motion. In the Initial R&R, the Court considered, among other evidence, testimony by the testifying officers that they had advised Defendant that she was not under arrest prior to interviewing her. The Court also considered the partial recording of the interview that was introduced into evidence.

On March 8, 2017, the District Judge ordered the prosecution to introduce evidence to clarify various issues relating to the digital recordings of Plaintiff's interview. *See* Order [114]. The District Judge also referred the matter back to the undersigned to convene a supplemental evidentiary hearing, and to issue a supplemental R&R detailing the undersigned's new findings of fact and any conclusions as to how those findings impact the resolution of the Motion to Suppress.

The undersigned convened a supplemental evidentiary hearing on May 8, 2017, for which a transcript ("Tr.") was prepared and filed on May 22, 2017 [125]. After filings of post-hearing briefs by the parties, the matter is now ripe for issuance of the supplemental R&R. As explained below, the undersigned makes certain additional or modified factual findings. For the reasons explained below, however, the Court ultimately concludes that the Motion to Suppress still should be **DENIED**.

## THE SUPPLEMENTAL HEARING

At the May 8 hearing, the Government re-called Agent Casey Roberts of the Georgia Department of Corrections.

Agent Roberts explained that he met Defendant at the front door of her house when he and other agents arrived to execute the search warrant. Tr. [125] at 5. "I explained to her what was going on, gave her a copy of the search warrant, and ultimately we went to the back porch to talk with her as the search warrants were being executed inside the residence. There was no place to talk." *Id.* Agent Roberts explained that he along with Agents Wolfe (GA Dep't of Corrections) and Clark (FBI) conducted this interview on the back porch. *Id.*

Agent Roberts (the lead investigator) recorded the interview, or at least the parts he was present for, with his digital audio recorder. *Id.* at 6-7. The Department of Corrections does not have a specific policy as to recording

interviews, but Roberts explained that he has a personal practice of recording interviews where possible. *Id.* at 9-10. Explaining why the recording appears to begin after the interview was already underway, Agent Roberts stated that Agents Clark and Wolfe initially began the interview on the patio. According to Roberts, he joined the group shortly after they began, and activated the recorder when he arrived. *See id.* at 7-8. Any brief discussion prior to when Roberts came out to the patio would not have been recorded. *Id.* Roberts was briefly delayed in joining the interview because, as the lead investigator supervising the search, he had to deal with certain administrative or logistical issues at the outset. *Id.*

During the course of the interview, Roberts was periodically interrupted when issues arose in the search requiring his oversight. *Id.* at 10-11. One or two times, Roberts had to leave the patio and handle an issue. *Id.* During any such period, Roberts stopped the recorder, which at all times was in his possession. *Id.* at 11. Roberts did this because he did not want to inadvertently record case-sensitive discussions with other agents about the mechanics of the execution of the search. *Id.* Roberts apparently did not consider or chose not to leave the recorder behind, in the possession of the other agents, to continue recording while he was absent. *Id.* Roberts stated that although he instinctively chose to record the interview, he otherwise did not "think of the importance of the tape," because it was a mere noncustodial interview. *Id.* When Roberts returned to the patio, he

turned the recorder back on. *Id.* at 11-12. This was Roberts' explanation for why the recordings of the interview were produced and introduced into evidence in three separate files, with some apparent gaps.

The testimony includes inconsistencies that somewhat confuse the exact chronology. In the original hearing, Roberts stated that "[t]here was nowhere really to talk, so we went out on the back porch. ***And that's where she [i.e., Defendant] and I started having the interview***. I explained to her that she was not under arrest, there was no arrest warrant, and she agreed to talk with us." Tr. [88] at 11-12 (emphasis added). However, in the supplemental hearing, Roberts stated that "there's a period at the beginning of the interview that I was not present on the porch. I was inside because I was the case agent for the search warrant. When I went outside, I started a tape recorder, small digital recorder." Tr. [125] at 6. In other words, in the original hearing, Agent Roberts suggested that he was part of the original group that took Defendant out to the back porch and that he initiated, or at least was present for the initiation, of the interview. In the second hearing, Agent Roberts suggested that he was not, in fact, present for the inception of the interview but rather joined the interview a few minutes after it had begun.

The recording does not memorialize any express advice to Defendant that she was not under arrest or that she was free to leave, at least in so many words. However, the recording includes multiple assurances, in response to Defendant's

statement that she did not want to go to jail, that "no one is talking about that," *see* Ex. 2 (Track 1, at 3:48, Track 3, at 3:59), that "I'm not going to say that you aren't going to be charged . . . but sitting here right now you and me talking, there are no charges on you," *see id*. (Track 3, at approx. 4:16), and, in response to Defendant's expression of concern about potentially losing her children, that "no one is talking about you losing your kids," *see id.* (Track 3, at 6:47).

Because the recorder was only activated once Agent Roberts joined the patio interview, it does not reflect any initial statements made to Defendant when the agents arrived and explained the situation. Agent Roberts stated that it would have been his standard practice to advise Defendant that she was not under arrest as part of the initial discussion in which he requested and she agreed to sit for an interview. Tr. [125] at 36-37. Moreover, although not during the recorded portion of the interview, Agent Clark testified that he also independently informed Defendant at the inception of the execution of the warrant that "we were just there to collect information." Tr. [88] at 41.[1]

---

[1] In its initial R&R, the Court cited the testimony of Agents Wolfe and Clark for the proposition that Defendant was expressly advised that she was not under arrest. *See* Initial R&R [96] at 4. Upon more careful reflection in connection with preparing this Supplemental R&R, however, the undersigned finds that these citations overstate what the agents said. Agents Wolfe and Clark were asked whether they told Defendant that she was under arrest, in response to which they testified "no." Tr. [88] at 31, 41. As noted above, Agent Clark also specifically stated that he told Defendant, "we were just there to collect information." Tr. [88] at 41. While that assurance is highly consistent with and similar to an assurance

Agent Roberts testified that it would have been standard procedure for Defendant to have been patted down at the beginning of the search, *see* Tr. [125] at 21, Tr. [88] at 12, and therefore the Court assumes that Defendant was patted down.  Neither Roberts, nor any other testifying officer (Clark, Wolfe or Dep't of Corrections Investigator Bricker) actually patted her down or observed someone else doing so.  *See* Tr. [88] at 12, 16, 31, 43, 56, Tr. [125] at 24, 27.  Agent Roberts noted that it was obvious to them at the inception of the search that the Defendant was not armed because she was dressed in a loose shirt and shorts.  Tr. [88] at 12, 69.  Nevertheless, based on standard procedures, the Court assumes that Defendant was subjected to a routine pat down at some juncture, likely at the inception of the search.

As explained in the Initial R&R, the Defendant ultimately agreed to accompany the agents to the bank to retrieve evidence for them from a safety deposit box.  Thus, after the interview on the back patio was complete, the Defendant went back into the house to change clothes and was accompanied by the only female investigator on the scene, Nola Bricker.  *See* Tr. [88] at 16, 54; Tr. [125] at 12.  The Defendant was accompanied by Investigator Bricker to change

---

that Defendant was "not under arrest," it does not appear that Agent Clark or Agent Wolfe specifically testified to having informed Defendant that she was "not under arrest," and the undersigned withdraws the citations in the initial R&R suggesting otherwise.

clothes right before the Defendant and the agents left the house for the bank, that is, after the entirety of the back patio interview. *See* Tr. [88] at 16, 54; Tr. [125] at 12.

In connection with the discovery production in this case, Roberts downloaded the files of the recordings and transferred the files to a disc. *Id.* at 3. The last track listed on the DVD, which is about 40 minutes long, is actually the chronologically first part of the interview that was recorded. *Id.* at 14. Roberts does not know why the files were sorted or placed in the order in which they appear on the disc, which Roberts attributes to a function of the computer. *Id.* at 14-15. The first track listed on the DVD, which is approximately 11 minutes long, is the chronologically second part of the interview, which also occurred on the back patio. *Id*. The middle and shortest track reflected activity in the bank, which occurred subsequent to the interview on the back patio. *Id*.

## ANALYSIS

As explained in the initial R&R, Defendant argues that she was "in custody" for purposes of *Miranda v. Arizona* while she was interviewed in her home. Defendant's principal factual allegation in support of this argument is that she was subjected to a strip and body cavity search immediately prior to her interview, which several law enforcement participants in the search (including Roberts, Clark and Wolfe) specifically denied. In recommending denial of the Motion to

Suppress, the Court found that no such alleged strip/body cavity search occurred, or at least that Defendant (who bears the burden to prove she was "in custody") had not demonstrated that it more likely than not that she was subjected to such a procedure. The Court also found that the totality of the facts otherwise combined to refute Defendant's alleged custodial status, including that Defendant had been advised that she was not under arrest.

After the supplemental testimony, the record is more muddled as to whether, when, and in what exact words Agent Roberts told Defendant that she was not under arrest. One thing is clear, however: Agent Roberts did not provide this advice at least in so many words during any period in which he was involved in the interview on the back patio. After all, no such statement is recorded, and Agent Roberts explained that the recorder was activated during the entirety of the interview for which he was present on the back patio.

Agent Roberts remains insistent, however, that he did in fact inform Defendant that she was not under arrest. If so, he must have done so prior to the back patio interview, such as during Roberts's unrecorded initial discussion with Defendant at the front door of the house. Indeed, Roberts explained that it was his typical practice and procedure to provide this assurance at the inception of the execution of a search warrant. Roberts acknowledged that he could not specifically recall the exact conversation at the inception of the search in this

particular case. However, he recalls that he told Defendant at some juncture that she was not under arrest, and he believes based on his typical practice that he did so prior to even sitting down to interview her.

Agent Roberts's recall of the precise chronology of events, however, appears somewhat confused. As noted above, in the initial hearing, he stated that he took Defendant to the back patio and that *he* initiated the interview with her there. In the supplemental hearing, to explain why his recording does not capture the very beginning of the interview, Agent Roberts stated that Agents Clark and Wolfe initially took Defendant out to the back patio and initiated the interview, and that he (Roberts) joined them after a brief delay, once the interview had begun. This imprecision weighs somewhat against the reliability of Agent Roberts's recollection as to whether, when, and in what words he told Defendant that she was not under arrest.

On the other hand, the record includes other evidence consistent with or similar to Agent Roberts's testimony that Defendant was assured that she was not under arrest. First, Agent Clark testifies that he separately assured Defendant that they were "just there to collect information." Tr. [88] at 41. Second, the Government points to various recorded statements by the agents that were highly consistent with the advice that Roberts believes he gave, including that there were no charges against Defendant, and on several occasions that nobody at that point

was talking about her going to jail.  Defendant does not suggest or claim that she expressed surprise at these assurances, or that they contradicted anything she had been previously told that morning or otherwise believed.  Indeed, the recording includes the agent's statement to the Defendant, towards the beginning of Track 3 (the chronologically-first track, from approx 3:40-4:00), that "no one has said anything about you going to jail yet have we?"  The Defendant's response is inaudible but it does not appear, and she does not now claim, that she contradicted that statement.  Indeed, just a few seconds afterwards, the interview agent (presumably Roberts) further assured her, "I'm not going to say that you aren't going to be charged . . . but sitting here right now you and me talking, there are no charges on you," *see id*. (Track 3, at approx. 4:16).

Moreover, from a review of Track 3 (the chronologically-first recording), Plaintiff's responses and tone appear calm and without apparent distress until approximately the 3:30 mark when Agent Clark refers to himself as being with the FBI.  That revelation is what appears to trigger Plaintiff to begin crying, and it was directly in response to her exhibition of distress at this point that the main interviewing Agent (presumably Roberts) assured her that "no one has said anything about you going to jail," "there are no charges on you," etc.

Third, although Defendant testified at length to the alleged strip search that she says she believes occurred, she did not claim that the agents otherwise said

anything to her to suggest that she was under arrest. Indeed, Plaintiff does not cite any testimony in which she claimed that she believed she was under arrest at all. Rather, she simply said "[w]ell, they came to my house, so I assumed that I was in trouble." Tr. [88] at 71. Of course it would have been obvious to anyone at that juncture that they were "in trouble." But this assumption does not refute that the investigators assured her that (i) they were just there to investigate, (ii) there were no charges currently against her, and, very similarly, (iii) that she was not currently under arrest.

   Thus, despite there being more confusion after the supplemental hearing, the Court continues to find that it is more likely than not that Defendant was advised and understood that she was not under arrest or at least that she was given substantially similar advice. Regardless, the Court does not find that the resolution of Defendant's motion turns on whether this particular phrase was stated. The record shows that Defendant was interviewed in her own home, that she was provided the opportunity for food, drink and cigarettes, that none of the officers drew weapons, placed her in handcuffs, took her to a squad car, or did anything else emblematic of an arrest, that none of the agents threatened her or made any inappropriate statements. To the contrary, the agents appropriately told her at various points that there were no charges pending, and that no one was talking about jail at that point.

As explained in the initial R&R, it is the Defendant's burden to show that she was "in custody" for purposes of invoking the entitlements and protections afforded by *Miranda*. The Court continues to find based on the totality of the facts summarized above that Defendant has not met this burden, and that she was not "in custody."[2]

---

[2] As explained in the Initial R&R, Defendant's brief in support of her Motion to Suppress [91] invokes the Government's non-compliance with *Miranda* as the sole basis for suppression, and does not separately argue that, even if non-custodial, her statements were otherwise involuntary under *Jackson v. Denno*, 378 U.S. 368 (1964). Thus, to the extent Defendant's 2-page boilerplate Motion to Suppress initially conclusorily cited *Jackson v. Denno*, this argument was abandoned in her post-hearing brief [91].

Nevertheless, for the reasons stated in the Initial R&R, if this question were considered, the Court would recommend that Defendant's statement also be found admissible under *Jackson v. Denno*. Many of the same factors apply, including that Defendant was not in custody, was in her own house, was not subjected to threats, promises or inappropriate statements of any kind, and was told that no charges were pending, that no one was discussing jail at that time, that the agents were only there to investigate, etc. The Court also continues to find that the principal factual basis of the Defendant's motion–the allegation that she was subjected to a strip and body cavity search–is not supported. Of particular significance to the *Jackson v. Denno* inquiry, the record discussed in the Initial R&R also shows that Defendant continued to cooperate and answer questions on separate occasions, over two months after the alleged trauma of the events of the morning of the search. This suggests that the Defendant's decision to cooperate did not result from any overwhelming intimidation that particular morning, but rather was willingly offered out of a belief that it might help her in the case. The totality of the facts thus support a finding of voluntariness purposes of *Jackson v. Denno* assuming that an argument otherwise has been maintained.

This matter is **READY FOR TRIAL**.

**IT IS SO RECOMMENDED** this 18th day of July, 2017.

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE